IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TODD BONDS, | : |
| | : |
| Plaintiff, | : |
| | : Case No. 2:20-cv-5367 |
| v. | : |
| | : Chief Judge Algenon L. Marbley |
| BERNE UNION LOCAL SCHOOLS, *et al.*, | : |
| | : Magistrate Judge Elizabeth P. Deavers |
| | : |
| Respondent. | : |
| | : |

## **OPINION & ORDER**

This issue is before this Court on Defendant's Motion for Summary Judgment (ECF No. 81) and Plaintiff's Motion for Summary Judgment (ECF No. 82). Plaintiff proceeds *pro se*. For the reasons that follow, Defendant's Motion for Summary Judgment (ECF No. 81) is **GRANTED** and Plaintiff's Motion for Summary Judgment (ECF No. 82) is **DENIED**.

### I. BACKGROUND

This lawsuit stems, in relevant part, from Defendant Daniel Snively denying Plaintiff Todd Bonds access to a football game in which his son was playing. On August 28, 2020, Mr. Bonds drove from Cincinnati to Sugar Grove, Ohio to watch his son play in a high school football game. (ECF No. 80-1 at 30). When Mr. Bonds arrived, several men in Berne Union attire approached him and asked whether he had a mask or a voucher. (*Id.* at 32). Even though he indicated that he had neither, the men permitted him to enter the venue. (*Id.*).[1]

The following week, on September 4, 2020, Mr. Bonds made the drive again to see his son

---

[1] Mr. Bonds provided conflicting testimony on this point at his deposition. *Compare* ECF No. 80-1 at 32 ("And these two guys who were up at the gate, they were saying 'you don't have a mask or a voucher?'") with *id.* at 29 ("and nobody asked me for a voucher, none of that.").

1

play. (ECF No. 80-1 at 38). When he arrived, a woman at the entrance told Mr. Bonds he would need a voucher to enter. (*Id.*). The woman then called over Mr. Snively, Berne Union Local School's Athletic Director, who confirmed that Mr. Bonds needed a voucher to enter the game. (*Id.*). According to Mr. Bonds, Mr. Snively was not "very friendly" and not "very collegial," and after some back and forth, Mr. Snively told Mr. Bonds "your son said don't let you in here." (*Id.* at 38-39).

It was at this point that Mr. Bonds looked down at Mr. Snively's wrist and saw markings that he claims he recognized to be "n***** dots," used to indicate membership in a white supremacist organization. (*Id.* at 40). At his deposition, Mr. Bonds could not describe the markings, admitting that his eyesight was impaired because he was not wearing his glasses. (*Id.* at 20, 41).

Mr. Snively then called over the police, and instead of engaging with them, Mr. Bonds left. (*Id.* at 41-42). Mr. Bonds then sent an e-mail to Principal Craig Heath at 5:47 p.m., in which he wrote that he was "just told no more than 5 minutes ago that I cannot attend tonight's game because all in attendance must have a voucher" and asked why he was not informed of the policy earlier, (ECF No. 82-1 at 1). He then wrote, "[t]his district hates black dads. I'm gonna have to pursue legal action now." (ECF No. 82-1 at 1). At 6:01 p.m., Mr. Bonds sent another email to Mr. Heath writing "[n]ow white supremacist Danny Snively just interfered with custody. A lawsuit will be mailed to the feds on Monday." (*Id.* at 12). About twenty minutes later, Principal Heath responded: "I just got to the stadium. Are you still nearby?" (ECF No. 82-1 at 4). At 7:47 p.m., Mr. Bonds sent another email, again threatening legal action "[u]nless your lawyers call me Monday and settle. . . . . [w]hoever it is better call quick." (*Id.* at 6).

Mr. Bonds and the District Superintendent, Jon Parker, had a phone call on September 15,

2

2020, after Mr. Bonds e-mailed Superintendent Parker requesting various records. (ECF No. 80-1 at 44). During his deposition, Mr. Bonds appears to have confused Superintendent Parker and Principal Heath, starting that Principal Heath indicated that Mr. Snively "should have reached higher up the ladder." (*Id.* at 37). But the emails and Mr. Bonds's affidavit clarify that the call was with Superintendent Parker. Mr. Bonds explains in an affidavit that during that call, Superintendent Parker "rebuked" Mr. Snively's behavior and "admitted that Mr. Snively is in a circle of individuals that are into extreme/subversive or questionable behavior." (ECF No. 82-1 at 14).

In his deposition, Mr. Bonds made several claims about Mr. Snively's purported ties to a white supremacist group. Specifically, he testified that he believed Mr. Snively has ties to a white supremacist group because of a photograph he saw on social media several years ago where Mr. Snively "was holding a rebel flag" and there was "something in the caption." (ECF No. 80-1 at 14). During his deposition, Mr. Bonds testified that he saw this photograph in either 2014 or 2015, (*id.* at 16), but in his affidavit he attests that he saw it in either 2021 or 2022, (ECF No. 82-1 at 14). He has been unable to produce the photograph. Mr. Bonds also points to the markings he claims he saw on Mr. Snively's wrist but cannot describe them in any detail since his vision was impaired. (ECF No. 80-1 at 20). Mr. Snively denies having any tattoos whatsoever. (ECF No. 81-4 at 5).

Over the course of this case's life, Mr. Bonds has brought suit against nine defendants, seven of which have been dismissed. In his Complaint and Amended Complaint, Mr. Bonds made several claims against Mr. Snively, including a claim for discrimination on the basis of race. (ECF No. 1-2 at 19). After screening the complaint under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), Magistrate Judge Deavers recommended, in relevant part, that this Court allow the action to

3

proceed against Snively. (ECF No. 5). Mr. Snively objected to the Report & Recommendation, (ECF No. 6), and this Court sustained Mr. Snively objections on all claims but Mr. Bonds's race discrimination claim, (ECF No. 8). In a Joint Motion for Judgment on the Pleadings filed by several defendants, Mr. Snively did not seek dismissal of the discrimination claim against him. (ECF No. 26 at 5). After the conclusion of discovery, Mr. Snively and Mr. Bonds each filed Motions for Summary Judgment (ECF Nos. 81, 82), both of which have been fully briefed and are ripe for review.

## II. STANDARD OF REVIEW

This court may grant summary judgment under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." When there are reasonable inferences that can be drawn from the record, they "must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). While pro se plaintiffs are sometimes held to less stringent standards than represented parties, the must still meet minimal standards under the Federal Rules of Civil Procedure. *See Perry v. United Parcel Serv.*, 90 F. App's 860, 861 (6th Cir. 2004).

The standard of review does not change when the parties file cross-motions, as they have here. *Cf. Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) ("[T]he standards upon which the court evaluates the motions for summary judgment do not change simply because the parties present cross-motions."). In other words, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d 240, 248 (quoting *Home for Crippled*

4

*Children v. Prudential Ins. Co.*, 590 F.Supp. 1490, 1495 (W.D.Pa. 1984)). Simply put, the standard of review on cross-motions is the same as the standard for unilateral summary judgment motions.

### III. LAW AND ANALYSIS

The Supreme Court has made clear that "[t]he central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). In other words, "[t]he Clause embodies the principle that all persons similarly situated should be treated alike." *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). As a result, "[t]he threshold element of an equal protection claim is disparate treatment." *Id.*

Additionally, "proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). A plaintiff need not show that racial discrimination was the sole motivation behind complained of government conduct but must show that it was at least a "motivating factor." *Id.* at 265-66. Absent a "stark" pattern that is "unexplainable on grounds other than race," a disparate impact on a certain racial group is "not determinative" of intent. *Id.* at 266. This Court must instead look to "such circumstantial and direct evidence of intent as may be available." *Id.*

### A. Differential Treatment

This Court turns first to whether there are any disputes of material fact with respect to whether Mr. Bonds was treated differently than any similarly situated non-minority person. Mr. Snively asserts that Mr. Bonds makes no attempt to show that he was treated differently than a person who is not a member of a minority group. (ECF No. 85 at 2). The closest thing to a

5

response that Mr. Bonds provides is his contention at his deposition that he was treated differently during his interaction with Mr. Snively than he was by other Berne Union staff when he attended another game a week prior.[2]  (ECF No. 80-1 at 29).  Specifically, Berne Union staff permitted him to enter the earlier game without a voucher after he explained that he did not have one,[3] but Mr. Snively refused to let him enter the game at issue.  (*Id.*).

This differential treatment, however, is not the sort of differential treatment contemplated by Equal Protection Clause doctrine.  In this context, equal protection doctrine requires that the plaintiff show that he was treated differently from a member of a different or non-minority racial group.  Mr. Bonds was, of course, a member of a minority-group on both occasions.  There are no facts in the record that suggest that other, non-minority parents were permitted to enter the game without a voucher.  The fact that Mr. Bonds only interacted with Mr. Snively at the second game, and that Mr. Bonds believes that Mr. Snively holds racist views, does not change this analysis.

In sum, there is no dispute of any material fact with respect to whether Mr. Bonds was treated differently than any member of a non-minority group.  This conclusion alone is fatal to Mr. Bonds's claim, but this Court will also consider the state of the evidence with respect to whether Mr. Snively acted with discriminatory intent.

### B.  Racially Discriminatory Intent

As an initial matter, Mr. Snively points out that Mr. Bonds does not allege that Mr. Snively ever mentioned Mr. Bonds's race during the interaction.  (ECF No. 81 at 6).  But such an overt invocation of race is not necessary.  Facially neutral government actions can violate the Equal

---

[2] Mr. Bonds also generally complains that Mr. Snively initially disseminated the voucher policy via social media, which Mr. Bonds accesses infrequently.  (ECF No. 82 at 7).  This is not an example of different treatment on the basis of race, though.  Without more, any dissatisfaction Mr. Bonds may have with the use of social media to share announcements to parents does not form the basis for an equal protection claim.

[3] Again, Mr. Bonds provided directly contradictory on whether he was asked for a voucher at the first game.  *See supra* n.1.

Protection Clause. *See Vill. of Arlington Heights*, 429 U.S. at 266.

Nonetheless, there is no dispute as to any material fact regarding whether Mr. Snively had discriminatory intent in refusing to admit Mr. Bonds to the game. Mr. Bonds raises several issues that he says show Mr. Snively was motivated by a discriminatory intent: (1) Mr. Bonds asserts that he once saw a photo on social media of Mr. Snively posing with a Confederate flag; (2) Mr. Bonds asserts that, during the interaction, he saw a tattoo on Mr. Snively's inner wrist that Mr. Bonds believes indicates membership in a white supremacist group; and (3) Mr. Bonds argues that comments made to him by a school official indicate that Mr. Snively harbors racist views.[4] This Court takes each of these contentions in turn.

### 1. Confederate Flag Photograph

During his sworn deposition, taken on March 29, 2023, Mr. Bonds testified that he accessed a third party's Facebook page in 2014 or 2015, and at that time, saw a photograph of Mr. Snively "holding a rebel flag." (ECF No. 80-1 at 14). Mr. Bonds went on to testify that after the interaction with Mr. Snively at the football game in September 2020, and after Mr. Snively was identified to Mr. Bonds by a school official, Mr. Bonds then began to "draw the connection" between the picture and the person he interacted with at the game. (*Id.* at 17). Only two and a half months after his deposition, on June 14, 2023, Mr. Bonds signed a sworn and notarized affidavit to accompany his Motion for Summary Judgment stating, instead, that he saw the photograph in question "in 2021 or 2022," well after the interaction with Mr. Snively. (ECF No. 82-1 at 14). Mr. Bonds makes no effort to explain this discrepancy. Mr. Bonds has been unable to produce the photo that he purports

---

[4] Mr. Bonds also claims that Mr. Snively stated in one of his filings that the district does not have many Black students. (ECF No. 83 at 7). From there, Mr. Bonds takes a soaring leap to claiming that, by doing so, Mr. Snively admitted that "his district might not take kindly to an assertive black male just out of the natural energy of the community." (*Id.*). This is not a justified inference. But more importantly, Mr. Bonds provides no citation for Mr. Snively's purported statement, and neither Mr. Snively nor this Court can locate such a statement.

7

to have seen.

Ordinarily, a Plaintiff's affidavit or deposition testimony is sufficient to create an issue of fact at this stage. *See Moran v. Al Basit LLC*, 788 F.3d 201, 206 (6th Cir. 2015) ("Despite the lack of corroborating evidence, Plaintiff's testimony is sufficient to create a genuine dispute of material fact that forecloses summary judgment at this juncture."). And "it is not an irrational inference that one who displays the confederate flag *may* harbor racial bias against African-Americans." *United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001) (emphasis in original) (reaching this conclusion in the context of a challenge to a potential juror).

But inconsistencies in testimony can render that testimony incredible. *See France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (concluding that an affidavit apparently filed to create an issue of fact by contradicting the affiant's prior sworn testimony should be stricken "unless the party opposing summary judgment provides a persuasive justification for the contradiction."); *Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 324 (6th Cir. 1998) (finding that "other than the inconsistent statements" in an affidavit, the party had "provided no evidence" on the issue). This Court might have been able to infer an honest mistake had Mr. Bonds simply been unable to pinpoint the exact year in which he saw a photograph on social media. Mr. Bonds is a *pro se* plaintiff, and as a result, is subject to "less stringent standards" with regard to some of the technicalities of litigation. *See Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011). But providing conflicting sworn testimony about whether he saw the photograph before or after the central incident in this case, without any persuasive justification for the inconsistency, undermines the credibility of the claim. As a result, this Court concludes that Mr. Bonds's affidavit and deposition testimony regarding the purported photograph of Mr. Snively with a Confederate flag are not credible and do not create a genuine issue of material fact with respect to whether Mr.

8

Snively was motivated by race in turning Mr. Bonds away from the game. Nor do they demonstrate an absence of material fact in Mr. Bonds's favor such that he is entitled to judgment as a matter of law.

### 2. White Supremacist Markings

Mr. Bonds's contention that Mr. Snively has "white supremacist markings" on the underside of his wrist meets a similar fate. During his deposition, Mr. Bonds conceded that he was not wearing his glasses during the interaction with Mr. Snively in which he purports to have seen the markings, and that, therefore, his vision was impaired. (ECF No. 80-1 at 20). Nonetheless, he insisted that the markings were "n***** dot" markings associated with a white supremacist group, (ECF No. 80-1 at 19), before explaining that the markings he saw were not actual dots, (ECF No. 80-1 at 40). To make matters worse, in his briefing, Mr. Bonds describes the markings variously as looking like those associated with the white supremacist "3%er" militia group, (ECF No. 83 at 6), or "consistent with skikaka," "The Great White Bat" from the film, *Ace Ventura: Pet Detective*, (ECF No. 82 at 7). For his part, Mr. Snively provides a sworn interrogatory response indicating that he does not have any tattoos whatsoever. (ECF No. 81-4 at 5).

If true, Mr. Bonds's belief that Mr. Snively possesses white supremacist tattoos might support his contention that Mr. Snively was, at least in part, motivated by discriminatory intent in refusing to allow him to enter the game. *See United States v. Armstrong*, 620 F.3d 1172, 1178 (9th Cir. 2010) (noting that "tattoos of swastikas and Nazi 'SS' lightening bolts" were evidence of a criminal defendant's "racial animus"). But Mr. Bonds admits that his eyesight was impaired during the encounter, and his inconsistent descriptions of the markings lack credibility. Again, evidence this thin and contradictory fails to defeat Mr. Snively's Motion for Summary Judgment, nor does not entitle Mr. Bonds to summary judgment.

9

### 3. Statements by a School Official

Finally, Mr. Bonds makes a series of claims about statements made to him by Superintendent Parker during a phone call after the September 4, 2020, football game. Mr. Bonds says Superintendent Parker told him: (1) that Mr. Snively should have "reached higher up the ladder" before denying him access to the game; and (2) that Mr. Snively "is in a circle of individuals that are into extreme/subversive or questionable behavior."[5]

Mr. Bonds raised the first statement—that Mr. Snively should have reached "higher up the ladder"—during his deposition.[6] Contrary to Mr. Bonds's assertion, any statement made by a school official about whether Mr. Snively ought to have escalated the issue to his superiors is irrelevant to the question of racially discriminatory motivation. This statement does not support a conclusion that the school official believed that Mr. Snively's "behavior constitute[d] a violation[] of Plaintiff's civil rights and Due process." (ECF No. 83 at 8).

Turning to Superintendent Parker's purported comment about Mr. Snively's "extreme" and "subversive" friends, Mr. Snively argues that the statement constitutes inadmissible hearsay.[7] *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (explaining that "an affidavit offered in opposition to summary judgment 'shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'") (quoting Fed.R.Civ.P. 56(e)). Hearsay is (1) an out of court statement (2) introduced for the truth of the matter that was asserted by the out-of-court speaker.

---

[5] Mr. Bonds also asserts in his Motion for Summary Judgment that the school official said that "You never know with these people," "Mr. Snively's friends are a weird bunch," and that "[t]enure is a beautiful thing…." (ECF No. 82 at 9). These statements were not made under oath and are, therefore, not evidence.
[6] As mentioned earlier, in the deposition Mr. Bonds attributes the statement to Craig Heath, the school principal. (ECF No. 80-1 at 42). Later, in his briefing, he attributes the statement to Berne Union Superintendent Parker. (ECF No. 82 at 8-9). Other evidence clarifies that the conversation was with Superintendent Parker.
[7] Mr. Bonds raised the purported statement about Mr. Snively's "subversive" friend group for the first time in his affidavit. (ECF No. 82-1).

*See* Federal Rule of Evidence 801(c).  It is evident that Mr. Bonds wishes this Court to consider these alleged statements about Mr. Snively's social circle as support for the truth of the matter that Superintendent Parker allegedly asserted: that Mr. Snively is part of a group of individuals with troubling (and presumably white supremacist) beliefs.  Even though not argued by Mr. Bonds, Superintendent Parker's statement would likely be admissible under the hearsay exception contained in Rule 803(21), "which provides an exception for statements regarding a 'person's character among associates or in the community.'"  *Owhor v. St. John Health-Providence Hosp.*, 503 F. App'x 307, 313 (6th Cir. 2012) (concluding that statements about "general reputation," as opposed to those about specific incidents, are admissible under the exception).

Nonetheless, this statement alone cannot create an issue of material fact regarding whether Mr. Snively acted with racially discriminatory motives in turning Mr. Bonds away from the game.  Even if the school official did describe Mr. Snively's social circle as "extreme," "subversive," or "questionable," the official made no indication that these beliefs were racial in nature.

In sum, this Court understands that Mr. Bonds's interaction with Mr. Snively was upsetting and embarrassing to him.  It is also true that Mr. Bonds is a member of a protected minority class.  But this Court urges Mr. Bonds to appreciate that his membership in a minority class does not turn every instance of upsetting treatment into a violation of the Equal Protection Clause.  Government actors may have many non-discriminatory reasons for treating Mr. Bonds in a way that frustrates him.  This is by no means to suggest that Mr. Bonds has never experienced discrimination on the basis of race, which is, unfortunately, alive and well in our society.  But in order to hold someone liable for violating the Equal Protection Clause and survive summary judgment, Mr. Bonds must produce some credible evidence that the complained-of conduct was motivated, at last in part, by discrimination.  A hunch is not enough.  On this record, there is no genuine issue of material fact

11

that leaves open the possibility that Mr. Bonds was denied access to the game because of his race, not because he did not have a voucher.

## IV. CONCLUSION

Having considered the Parties Motions for Summary Judgment (ECF Nos. 81, 82), this Court **GRANTS** Defendant's Motion and **DENIES** Plaintiff's Motion. Given that this is the last remaining claim against Mr. Snively, he is **DISMISSED** as a Defendant in this case.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: March 7, 2024**